RECEIVED

AUG 2 8 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

_____

LAWRENCE RICKS                                    CIVIL ACTION NO. 12-0349

-vs-                                                                    JUDGE DRELL

CITY OF ALEXANDRIA, et al.                 MAGISTRATE JUDGE KIRK

═══════════════════════════════════════

## RULING

Before the Court are several motions including: a "Motion for Summary Judgment Based on Lack of Causation" (Doc. 70),[1] a "Motion for Summary Judgment Based on the LPLA" (Doc. 72), a "Motion in Limine to Exclude Opinion Witness Walter Kerwin, M.D." (Doc. 69), and a "Motion in Limine to Exclude Opinion Witness Larry Alan Smith" (Doc. 71). The "Motion for Summary Judgment Based on Lack of Causation" and the motions in limine were filed jointly by all original Defendants in the case. Since the time these motions were originally filed, all Defendants, with the exception of Taser International, have been dismissed from the case on summary judgment. (See docs. 108–09). The "Motion for Summary Judgment Based on the LPLA" was filed by Defendant Taser International ("TI") alone. Plaintiff filed oppositions to all the motions except the LPLA motion filed by TI. We have considered the arguments by the parties contained in their briefs and the matters are

---

[1]     The "Motion for Summary Judgment Based on Lack of Causation was denied as moot in a prior ruling as to a number of defendants who were dismissed from the case. However, it is still pending in regard to Defendant Taser International. (See docs. 108–09).

ripe for disposition. Each motion will be discussed in turn.

I.   **Procedural Background**

Plaintiff Lawrence Ricks ("Plaintiff") is suing the Defendants for the wrongful death of his son, Robert Ephraim Ricks ("Mr. Ricks"). (Doc. 1 at 3). Mr. Robert Ricks died in the custody of the Rapides Parish Sheriff's Office on February 6, 2011.[2] (Doc. 73-13 at 1, 7). Plaintiff contends that Mr. Ricks' death was proximately caused when Rapides Sheriff Deputy James Brunet used a Taser Electronic Control Device ("ECD")[3] manufactured by TI to impose a drive-stun taser application. (Doc. 1 at 5; Doc. 10 at 9). The allegations in the Complaint regarding the circumstances leading to Mr. Ricks' death, which have been outlined in the Magistrate Judge's Report and Recommendation previously adopted by this Court, are as follows:

> [Plaintiff] alleges in his complaint that, on February 5, 2011, Maxine Jones called 911 for assistance because her grandson, Robert [Ricks], was sweating and shaking very badly. [Mr. Ricks] had a history of bipolar disorder and schizophrenia. [Plaintiff] alleges that Acadian Ambulance Service and the Alexandria Fire Department responded to the call and noted [Mr. Ricks] was diaphoretic with dilated pupils, but he refused medical treatment and retreated to a backroom in the house, where he appeared to be agitated and restless but not combative. [Plaintiff] alleges the Alexandria Police Department was called by Acadian Ambulance, and officers entered the home and tried to talk [Mr. Ricks] into going to the hospital; [Mr. Ricks] was very restless. [Plaintiff] alleges that Maxine Jones convinced [Mr. Ricks] to go to the hospital, but when she said she could not go with him, he grabbed her and 'allegedly' fell on her. [Plaintiff] alleges [Mr.] Ricks was then handcuffed

---

[2]   Plaintiff alleges in his complaint that Robert Ricks died on February 5, 2011. (Doc. 1 at 3). However, according to the autopsy report, Robert Ricks' official time of death was thirteen minutes after midnight on February 6, 2011.  (Doc. 73-13 at 1).

[3]   A Taser Electronic Control Device ("ECD") is synonymous with a Taser Conducted Electrical Weapon ("CEW"). As both labels are utilized by the parties in this case, as well as in similar cases before our sister courts, both terms will appear in this ruling interchangeably.

and led to a patrol car, where he sat down but refused to put his feet in the car. [Plaintiff] alleges Officer Kirk performed two knee strikes to [Mr. Ricks's] common peroneal, to no avail, so Officer Joffrion tasered [Mr. Ricks] in his right thigh area; [Mr. Ricks] then placed his feet in the car and was transported to the Rapides Parish jail. [Plaintiff] alleges in his complaint that, upon arrival, [Mr. Ricks] exited the car escorted by two sheriff's deputies, but a struggle broke out in which [Mr. Ricks] was alleged to have kicked and yelled; four deputies then carried [Mr. Ricks] into the elevator and up to the jail.[4] [Plaintiff] alleges that [Mr. Ricks] was held down on the ground until the isolation cell was available, then picked up and another struggle started; [Deputy] Mark Wood kicked [Mr. Ricks] in the shoulder area to push him back to the ground, then held [Mr. Ricks'] shoulders. [Plaintiff] alleges that, at some point, [Mr. Ricks] was tasered in the back by [Deputy James] Brunet,[5] then moved toward the cell, but as he was moved his body went limp; [Mr. Ricks] was placed in the cell and observed not to be breathing.

(Doc. 25 at 1–2).

Plaintiff's Complaint, filed on February 3, 2012, asserts products liability actions based in negligence and strict liability against TI as the manufacturer of the two tasers used on Mr. Ricks. (Doc. 1 at 11–15). At issue is whether TI is liable under the Louisiana Products Liability Act. (Id.). To determine potential liability under the

---

[4]     Although Plaintiff alleges in his Complaint that four deputies with the Rapides Parish Sheriff's Office carried Mr. Ricks into the jail, a review of the evidence provided shows this to be inaccurate. In actuality, as described in additional detail below, the "four-man carry" was accomplished by a combination of Sheriff's deputies and City of Alexandria police officers.

[5]     It is unclear from the record whether the Taser administration at issue by Deputy Brunet of Rapides Parish Sheriff's Office to Mr. Rick's lower back occurred with the model M26 or model X26 Taser ECD. Defendant states in its Motion in Limine to Exclude Opinion Witness Walter Kerwin that the first Taser administration was a "5-second CEW drive-stun from a Taser X26 model to Ricks' thigh" and the second Taser administration was a "2 to 3 second CEW drive-stun from an M26 model to Ricks' lower back." (Doc. 69-1 at 5–6). This is consistent with Patricia Robinson's Declaration and Defendant Sheriff's Office Rapides Parish's Statement of Material Facts. (Doc. 73-4 at 6; 66-3 at 1–2). However, this is inconsistent with Taser International CEO Patrick Smith's Declaration stating the M26 CEW was sold to the Alexandria Police Department and the X26 CEW was sold to Rapides Parish Sheriff's Office and Defendants' Joint Statement of Material Facts that also asserts the Alexandria Police Department used model M26 and Rapides Parish Sheriff's Office used model X26. (Doc. 73-6 at 3; Doc. 71-2 at 4).

3

LPLA, we must first examine the threshold issue of whether Plaintiff can prove the causation necessary to proceed on his LPLA claim. Thus, we discuss the "Motion for Summary Judgment Based on Causation" before turning to the "Motion for Summary Judgment Based on the LPLA." Following, the Court will determine Defendant's pending motions in limine pertaining to the witness testimony of Dr. Kerwin and Mr. Smith.

## II.    Motions for Summary Judgment

### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider "all evidence in the light most favorable to the party resisting the motion." Seacor Holdings, Inc. v. Commonwealth Ins. Co., 635 F.3d 675, 680 (5th Cir. 2011)(internal quotations omitted). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

### B.    Based on Lack of Causation

In the "Defendant['s] Joint Motion for Summary Judgment Based on Lack of Causation" (Doc. 70), Defendant argues causation is an essential element under both the Louisiana Products Liability Act ("LPLA") and Fourteenth Amendment claims.

4

(Doc. 70-1 at 7). That is, the death must have been caused by the Defendants' (or any Defendant's) conduct. They allege there is no causation attributable to any named defendant. All named Defendants with the exception of Taser International have been dismissed from the case in a prior ruling and order. (See docs. 108–09). The "Motion for Summary Judgment Based on Lack of Causation" was denied as moot as to the dismissed Defendants. (Id.). However, the issue of causation is critical to Plaintiff's claim under the Louisiana Products Liability Act against Taser International.

In a case as this one where multiple causes of death are likely present, the standard for causation against a Defendant is the "substantial factor" test. Roberts v. Benoit, 605 So. 2d 1032, 1042–43 (La. 1991). The relevant inquiry at the motion for summary judgment stage is whether there is a genuine dispute of material fact concerning whether Defendant's actions were "a substantial factor in bringing about" Mr. Ricks's death. Perkins v. Entergy Corp., 782 So. 2d 606, 611 (La. 2001).

Considering the facts in the light most favorable to Plaintiff, we find a genuine dispute of material fact concerning whether the Taser ECD used on Mr. Ricks by Rapides Parish Deputy Brunet was a substantial factor in his death. Defendant argues Plaintiff's expert witness should not be permitted to testify regarding causation of Mr. Ricks's death under Daubert. Plaintiff's expert witness, Dr. Walter Kerwin, is a cardiac electrophysiologist and board certified by the American Board of Internal Medicine in internal medicine, cardiovascular diseases, and clinical cardiac electrophysiology. (Doc. 85-1 at 1–2). According to Dr. Kerwin's expert opinion, the discharge of the Taser device was a substantial factor causing Mr. Ricks's death. As

discussed *infra*, the Court will permit Dr. Kerwin to testify as an expert witness about the cause of Mr. Ricks's death. At this stage, it is appropriate for both parties to present and cross-examine experts and for the factfinder to determine whether Deputy Brunet's use of his Taser device was a substantial factor in causing the death of Mr. Ricks. Because this remains a genuine dispute of material fact, TI's "Motion for Summary Judgment Based on Lack of Causation" will be **DENIED**.

### C.      Based on Louisiana Products Liability Act

Defendant TI filed its "Motion for Summary Judgment Based on the LPLA" on August 30, 2013 (Doc. 72). Plaintiff did not file a timely opposition to the motion; thus the unopposed motion for summary judgment standard applies.

### 1.      Unopposed Motion for Summary Judgment Standard

A court cannot grant summary judgment simply because the nonmoving party fails to oppose the motion, even if the failure to oppose violates a local rule. Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir. 1985). The moving party "has the burden of establishing the absence of a genuine [dispute] of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed." Id. However, in this District, Local Rule 56.2 gives added direction when summary judgment is unopposed: "All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for the purposes of the motion, unless controverted as required by this rule."

### 2.      Louisiana Products Liability Act

The Louisiana Products Liability Act ("LPLA") "establishes the exclusive theories of liability [in Louisiana] for manufacturers for damage caused by their products." La. R.S. 9:2800.52; see also Evans v. Ford Motor Co., 484 F.3d 329, 334–35 (5th Cir. 2007).[6] The applicable standard under the LPLA is as follows:

> The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product *unreasonably dangerous* when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

La. R.S. 9:2800.54 (italics added). There are four categories which render a product "unreasonably dangerous" under the LPLA: (1) construction or composition; (2) design; (3) inadequate warning; (4) failure to conform to express warranty. Id. The "unreasonably dangerous" characteristic must exist at the time the product left control of the manufacturer or result from a reasonably anticipated alteration or modification of the product. Id. Plaintiff has the burden of proving the required elements under the LPLA. Id.

Plaintiff alleges "Defendant['s] product is unreasonably dangerous and defective for use on human beings because, among other reasons, it was sold without warnings as to the effect of consistent multiple shocks, the danger of shocking (electrocuting) people; who are under the influence of drugs and the effects of excessive Taser shocks on respirations such that the weapon may cause unnecessary deaths." [sic] (Doc. 1 at ¶ 36). Plaintiff contends Defendant TI failed to provide an adequate warning and training about its' product's "potential for causing death and

---

[6]     In his Complaint (Doc. 1 at 11–15), Plaintiff asserts a products liability claims for negligence and strict liability against TI. We address both claims under the LPLA because of the exclusive nature of the act.

great bodily injury" and specifically, the failure to warn about the "increased
production of lactic acid caused by a product of muscle metabolism." (Id. at ¶¶ 37,
43). In addition, Plaintiff alleges TI negligently designed, manufactured, and
warranted the Taser device. (Id. at ¶ 38).

> ### 3.    Taser International

Although Plaintiff alleged in his complaint that TI negligently designed,
manufactured, and warranted their product, the Court finds no evidence in the record
to support these claims.

First, to prove a claim of product liability for unreasonably dangerous design,
the Plaintiff must prove: "(1) an alternative design existed at the time the product left
the manufacturer's control; (2) the alternative design could have prevented the
claimant's damage; and (3) if an alternative design existed that was capable of
preventing the damage, the utility of the product must be weighed against the risk of
harm. (Doc. 72-1 at 19) (citing La. R.S. 9:2800.56; Bernard v. Ferrellgas, Inc., 689 So. 2d
554, 558 (La. App. 3d Cir. 1997)). In this case, Plaintiff provided no evidence to
support the contention that there is a design defect or any evidence regarding an
alternative design. Therefore, the Defendant's motion for summary judgment as to
unreasonably dangerous design will be appropriately **GRANTED**.

As for a manufacturing defect, a product is "unreasonably dangerous in
construction or composition if, at the time the product left its manufacturer's control,
the product deviated in a material way from the manufacturer's specifications or
performance standards for the product or from otherwise identical products

manufactured by the same manufacturer." (Doc. 72-1 at 17–18) (citing La. R.S. 9:2800.55). Officer Jerrod King of the Alexandria Police Department,  a Taser International Master Instructor, stated in his affidavit that he tested the Taser devices used on Mr. Ricks on February 7, 2011, and found no indication of any malfunction. (Doc. 73-23 at ¶¶ 2, 4, 16). However, there remains a genuine dispute of material fact as to whether the product utilized on Mr. Ricks deviated in a material way from the manufacturer's specifications or performance standards. At this point in litigation, it is not clear from the record which of the two described weapons were used by Deputy Brunet, let alone whether it was in proper working order. See supra, note 5. For this reason, summary judgment as to this claim will be **DENIED.**

Regarding the existence of express warranty, there is no evidence that TI provided any warranty, defective or otherwise to Mr. Ricks.  Patrick W. Smith, Co-founder and CEO of TI, stated he had no direct contact with Mr. Ricks and did not provide any kind of warranty. (Doc. 73-6 at ¶¶ 2, 20). Since the Plaintiff has not produced any evidence in support of this claim, Defendant's motion for summary judgment will be **GRANTED.**

The final category under which a product can be "unreasonably dangerous" under the LPLA is for inadequate warning. La. R.S. 9:2800.54. A manufacturer may be liable for inadequate warning if "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product" at the time the product left the manufacturer's control. La. R.S. 9:2800.57(A).

Whether a warning is adequate is generally a question for the trier of fact, but summary judgment can be appropriate where a Plaintiff fails to produce evidence to support his claim. Jack v. Alberto-Culver USA, Inc., 949 So. 2d 1256, 1259 (La. 2007).

In the case at bar, Plaintiff contends TI failed to warn about the effect of multiple shocks or effects on individuals under the influence of drugs, among others. (Doc. 1 at 11–15). However, the record reflects the warnings in use at the time of the incident involving Mr. Ricks explicitly warned about these specific potential adverse effects. On the date of the incident in question, February 5, 2011, the May 1, 2010 warnings were in use for Taser models M26 and X26.[7] (Doc. 73-3 at 1). The evidence in the record clearly shows TI's warnings in effect at the time of the incident unequivocally cautioned Taser users about every danger alleged by Plaintiff in his complaint.

Following, first, Plaintiff contends the Tasers used on Mr. Ricks were "sold without warnings as to the effect of consistent multiple shocks." (Doc. 1 at ¶ 36). However, the safety information states:

> **Minimize Repeated, Continuous, or Simultaneous Exposures.**
> Reasonable efforts should be made to minimize the number of ECD [Electronic Control Device] exposures. ECD Users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should reassess the subject's resistance level before initiating or continuing the exposure.

(Doc. 73-3 at 2)(Internal citation omitted, emphasis in original).

Plaintiff also alleged there was inadequate warning that use of Taser devices

---

[7]   These warnings were effective beginning on May 1, 2010 and superseded all previously issued warnings. (Doc. 73-3 at 1).

could cause great bodily injury or death. (Doc. 1 ¶ 37). Contrary to Plaintiff's

allegations, there are multiple warnings stating that the use of Taser devices may

cause injury or death:

> These safety warnings are for your protection as well as the safety of others. Disregarding this information could result in **death or serious injury.** (Doc. 73-3 at 1) (Emphasis added).

> Failure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in **death or serious injury** to the User, force recipient, and others. (Id.) (Emphasis added).

> Resistance to law enforcement interaction incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of **death or serious injury.** (Id.) (Emphasis added).

> Confronting, apprehending, capturing, controlling, restraining, incapacitating, taking persons into custody, and maintaining custody are often high risk events that could result in **death or serious injury.** (Id.) (Emphasis added).

> Any use of force, physical exertion, capture, control, restraint, or incapacitation involves risks that a person **may get hurt or die.** (Id. at 2) (Emphasis added).

> ALWAYS obey all safety messages ... to reasonably minimize the risk of **death or serious injury**.... (Id.) (Emphasis added).

> The signal word WARNING indicates a hazardous situation which, if not avoided or heeded, could result in **death or serious injury**. (Id.) (Emphasis added).

Plaintiff offered no other proof in support of his claim.

Third, Plaintiff contends Defendant TI failed to warn users of Taser devices

about the effect of Taser use on individuals who are under the influence of drugs.

(Doc. 1 at ¶ 36). However, TI does include a warning about the effect of a Taser device

on a person under the influence of drugs:

11

> **Physiologically or Metabolically Compromised Persons.** Law
> enforcement personnel are called upon to deal with individuals in crises
> that are often **physiologically or metabolically compromised and may
> be susceptible to arrest-related-death ("ARD").** The factors that may
> increase susceptibility for an ARD have not been fully characterized but
> may include: a hypersympathetic state, autonomic dysregulation,
> capture myopathy, hyperthermia, altered electrolytes, severe scidosis,
> cardiac arrest, **drug or alcohol effects** (toxic withdrawal, sensitization to
> arrhythmias, etc), alterations in brain function **(agitated or excited
> delirium)**, cardiac disease, pulmonary disease, sickle cell disease, and
> other pathologic conditions. These risks may exist prior to, during, or
> after law enforcement intervention or ECD Use, and the subject may
> already be at risk of death or serious injury as a result of pre-existing
> conditions, individual susceptibility, or other factors. In a physiologically
> or metabolically compromised person **any physiologic or metabolic
> change may cause or contribute to death or serious injury.** Follow your
> agency's Guidance when dealing with physiologically or metabolically
> compromised persons.

(Doc. 73-3 at 4)(Some emphasis added). Thus, the record shows Defendant TI did

warn about the dangerous effects of Taser devices on individuals under the influence

of drugs and Plaintiff lacks support for his allegation.

Lastly, Plaintiff alleges Defendant TI failed to warn about the "increased

production of lactic acid caused by a product of muscle metabolism." (Doc. 1 at ¶ 43).

However, TI's warnings clearly acknowledge this possibility.

> **Physiologic or Metabolic Effects.** The ECD can produce physiologic or
> metabolic effects which include, but are not limited to, changes in:
> acidosis; adrenergic states; blood pressure; calcium; creatine kinase
> ("CK"); electrolytes (including potassium), heart rate and rhythm; **lactic
> acid;** myoglobin; pH; respiration; stress hormones or other biochemical
> neuromodulators (e.g., catecholamines). Reasonable effort should be
> made to minimize the number of ECD exposures and resulting
> physiologic and metabolic effects. In human studies of electrical
> discharge from a single ECD of up to 15 seconds, these effects on
> acidosis, CK, electrolytes, stress hormones, and vital signs have been
> comparable to or less than changes expected from physical exertion
> similar to struggling, resistance, fighting, fleeing, or from the application
> of some other force tools or techniques. Adverse physiologic or

12

metabolic effects may increase risk of death or serious injury.

(Doc. 73-3 at 4)(Some emphasis added). Plaintiff likewise failed to prove his contention in this regard.

Plaintiff did not oppose TI's Motion for Summary Judgment and Plaintiff's blanket allegations have no supporting evidence to show TI's warnings were inadequate. Thus, Defendant's motion for judgment based on the LPLA will be likewise **GRANTED** as to Plaintiff's inadequate warning claim.

Without opposition there is no proof Taser devices are "unreasonably dangerous" by design, express warranty or inadequate warning. Thus while summary judgment will be **GRANTED** as to Plaintiff's  design, express warranty, and inadequate warning claims under the LPLA, summary judgment will be **DENIED** as to Plaintiff's claim that the Tasers utilized on Mr. Ricks had a defect in construction or composition. This issue will be resolved at trial. Therefore, Defendant TI's unopposed "Motion for Summary Judgment Based on the LPLA" (Doc. 72) will be **GRANTED in PART and DENIED in PART** in a separate order.

## III.   Motions in Limine to Exclude Expert Testimony

### A.   Daubert Standard

The motions in limine to exclude expert testimony are evaluated in accordance with the Federal Rules of Evidence and governing jurisprudence. Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge
        will help the trier of fact to understand the evidence or to
        determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods;
        and

(d)     the expert has reliably applied the principles and methods to the
        facts of the case.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592–93 (1993), trial courts act as "gatekeepers," making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." The gatekeeping function is meant to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." Id. at 589.

The party offering expert testimony is not obligated to prove the testimony is correct. Rather, the party bears the burden of establishing "by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chemical, Inc., 151 F.3d 269, 276 (5th Cir. 1998), cert. denied, 526 U.S. 1064 (1999).  In analyzing reliability, the trial court must assess whether the reasoning or methodology supporting the expert's testimony is valid. The purpose is to exclude expert testimony based solely on subjective belief or unsupported speculation. See Daubert, 509 U.S. at 590. "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under Fed. R. Evid. 702." Munoz v. Orr, 200 F.3d 291, 301 (5th Cir. 2000).

Daubert provides an illustrative (but not exhaustive) list of factors district courts may use to evaluate the reliability of expert testimony. These factors include

whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593–94.

Subsequently, in Kumho Tire Co., v. Carmichael, 526 U.S. 137, 150 (1999), the Supreme Court emphasized the Daubert analysis is a "flexible" one, and "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. The Kumho Tire Court expounded that the district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152. As the Fifth Circuit explained, "[a]lthough there are no certainties in science, the expert must present conclusions grounded in the methods and procedures of science." Wells v. SmithKline Beecham Corp., 601 F.3d 375, 378 (5th Cir. 2010) (internal quotations omitted). The Fifth Circuit further clarified that "not every Daubert factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." Guy v. Crown Equipment Corp, 394 F.3d 320, 325 (5th Cir. 2004).

As Judge Vance noted in Kirkland v. Marriott International Inc., 416 F.Supp.2d 480, 484 (E.D. La. 2006), the Advisory Committee Note to Rule 702 of the Federal Rules of Evidence explains testimony from an expert whose reliability is based mainly

on the expert's personal observations, professional experience, education, and training may be admissible. Specifically, the Committee Note provides:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

Additionally, in Pipitone v. Biomatrix, 288 F.3d 239, 245–50 (5th Cir. 2002), an expert's testimony was found to be reliable even though he did not perform any experiments to test his conclusions. Rather, he simply reviewed the available literature, applied his knowledge to the situation, and ruled out other explanations because they were not probable under the facts of the plaintiff's case. Likewise, in St. Martin v. Mobil Exploration and Producing, 224 F.3d 402, 405–07 (5th Cir. 2000), an ecologist's expert testimony was deemed reliable when it was based upon his observations of a flooded marsh and his expertise in marshland ecology.

### B.     Dr. Walter Kerwin (Doc. 69)

Plaintiff offers Dr. Walter Kerwin to testify as to the cause of death of Mr. Robert Ricks. (Doc. 85 at 1–2). To begin, we find Dr. Kerwin's training, education, and experience are more than adequate to qualify him as an expert in the fields of internal medicine, cardiology and electrophysiology. After earning a Doctor of Medicine degree from the University of Illinois in 1989, Dr. Kerwin completed a general internal medicine internship at Northwestern University Medical School in Chicago, IL; a general internal medicine residency at Loyola University Medical Center in Maywood, IL; a post doctoral fellowship in cardiovascular medicine at Stanford University School

16

of Medicine in Stanford, CA; a fellowship in clinical and interventional cardiology at the Western Heart Institute of St. Mary's Hospital in San Francisco, CA; and a fellowship in clinical cardiac electrophysiology at the University of California San Francisco. (Doc. 85-1 at 1–2). Dr. Kerwin has been a licensed physician and surgeon in the state of California since 1992 and is certified by the National Board of Medical Examiners. (Id. at 2). Dr. Kerwin is also board certified by the American Board of Internal Medicine in internal medicine, cardiovascular diseases, and clinical cardiac electrophysiology as well as a Fellow of the American College of Cardiology. (Id. at 1–2). Currently, Dr. Kerwin is employed as a staff cardiologist and electrophysiologist at Cedars-Sinai Medical Center and as an Assistant Clinical Professor of Medicine at the University of California Los Angeles. (Id. at 1). Dr. Kerwin has eight publications and more than a dozen abstracts as well as extensive teaching and speaking experience about various cardiology-related topics including sudden cardiac death. (Id. at 3–9).

Based on his extensive training as a licensed and board certified doctor of internal medicine, Dr. Kerwin is qualified to testify about seizures, diaphoresis, dilated pupils, excited delirium, cocaine intoxication, benzoylecgonine, hydrocodone, rhabdomylosis, troponin, hyperthermia, metabolic acidosis, nephrosclerosis, obesity, the effect of stress on the body, emergency medical treatment, and medical causation. With Dr. Kerwin's extensive experience as a cardiologist, he may also testify about the effect of an adrenaline surge on the heart, coronary vasoconstriction, hypertensive atherosclerotic cardiovascular disease, myoglobin, increased creatine

17

kinease, and cardiomegaly. Given Dr. Kerwin's specialization in cardiac electrophysiology, we find that Dr. Kerwin is qualified to testify regarding the physiological effect of electricity from an external stimuli on the human body because he has education and expertise in electricity and its effects on the heart.

Nevertheless, Defendant Taser International contends Dr. Kerwin is not qualified to testify because his opinions are built on "inadmissible speculation." (Doc. 69-1 at 13–14). Plaintiff counters that during the deposition there were times that Dr. Kerwin had to speculate to answer opposing counsel's question, "but there is no doubt that his testimony is based on reasonable medical certainty." (Doc. 85 at 5). Furthermore, Defendant argues Dr. Kerwin, though a cardiologist and electrophysiologist, is not qualified to render any expert opinion on the physiologic effects of a CEW ["Conducted Electrical Weapon"]. (Doc. 91 at 1) (citing Flores v. Johnson, 210 F.3d 456, 464 (5th Cir. 2000)("In the federal courts, one does not become qualified to provide 'expert scientific' evidence merely by virtue of possessing a medical or other advanced degree.")). Defendant cites three unreported taser-related cases in support of their contention that Dr. Kerwin is not a qualified expert to testify about the cause of death: Glowczenski v. Taser Intern., Inc., No. 04-4052, 2012 WL 976050, at *4–10 (E.D. N.Y. Mar. 22, 2012); Salinas v. City of San Jose, No. 09-04410, 2010 WL 7697467, at *2–3 (N.D. Cal. Nov. 24, 2010); and Oliver v. City of Orlando, No. 06-1671, 2011 WL 2174010, *3–9 (M.D. Fla. May 31, 2011). (Doc. 69-1 at 13–14; Doc. 91 at 2–3). Each of these cases will be discussed in turn and then distinguished from the case at bar below.

In Glowczenski, the court found the plaintiff's forensic pathologist was not qualified to testify as an expert regarding the decedent's cause of death because the forensic pathologist was not an expert about the effect of Taser ECDs on the human body.  Glowczenski v. Taser Intern., Inc., No. 04-4052, 2012 WL 976050 (E.D. N.Y. Mar. 22, 2012). As the court explained, all of the forensic pathologist's knowledge about how a Taser device works came from a "twenty minute internet search the night before his deposition, during which he read the top ten results." Id. at *7. The forensic pathologist also stated that he did not have time to review literature on the subject so the court found "his entire opinion was based on six documents provided to him by plaintiffs' counsel" and also that he had "no knowledge of any articles which support his opinion." Id. (Internal quotations and citations omitted). Furthermore, the forensic pathologist discredited the medical examiner's cause of death of exhaustive mania as incorrect, but admitted that he had no knowledge about exhaustive mania. Id. at *8.  Thus the Glowczenski Court based its determination on multiple indications of unreliability and concluded the expert witness was "inadequately prepared to discuss these topics." Id. at *10.

Unlike Glowczenski, the case at bar is not a case of a completely unprepared expert witness. There is no evidence clearly showing that Dr. Kerwin has no knowledge about the cause of death supported by the defendant, no prior experience with the effect of electricity on the human body, and is inadequately prepared.  Here, Dr. Kerwin is competent to testify as a medical expert witness and is familiar with the specific facts of the case, cocaine intoxication, excited delirium, and the potential

effects of electricity on the body.

Taser International also cites a California state case in which the forensic pathologist-medical causation expert was not permitted to testify that the administration of a Taser device was the cause of death because the forensic pathologist did not have substantial experience with Taser devices.  Salinas v. City of San Jose, No. 09-04410, 2010 WL 7697467, at *2–3 (N.D. Cal. Nov. 24, 2010).  However, the Salinas Court did find that the forensic pathologist could testify as to the "physiological mechanisms by which pain, physical stress, and psychological stress can contribute to death under certain circumstances." Id. at *3.  Furthermore, the Salinas Court also added that if the forensic pathologist could prove the use of the ECD["Electronic Control Device"] caused the decedent's death with other admissible evidence, then the forensic pathologist's testimony regarding ECDs would be relevant. Id.

While the Salinas Court did not permit the forensic pathologist to testify that the cause of death was specifically a Taser device administration, the Salinas Court did not bar all testimony from the forensic pathologist expert witness. That court did allow the forensic pathologist to testify about how physiological mechanisms can contribute in death in some situations. Thus, any expert witness testimony from Dr. Kerwin regarding how physiological mechanisms triggered by pain, physical stress, and psychological stress can contribute to death is permitted.  Furthermore, if Dr. Kerwin can support his contention that the Taser Electronic Control Device drive-stun was the cause of death through other scientifically reliable and admissible evidence,

then Dr. Kerwin's testimony regarding the effects of Taser ECDs specifically would be relevant.

In <u>Oliver</u>, the Court excluded the expert testimony of a forensic pathologist regarding cause of death because he lacked knowledge about the effect of Taser CEWs ("Conducted Electrical Weapons") and electricity on the human body.  <u>Oliver v. City of Orlando</u>, No. 06-1671, 2011 WL 2174010, *3–9 (M.D. Fla. May 31, 2011). Defendant contends that while the Court found the forensic pathologist was "qualified to testify competently on causes of death," his testimony should be excluded because he lacked specific knowledge about CEWs, how they work, and their effect on the human body.  (Doc. 91 at 2). Defendant TI argues that although Dr. Kerwin may be qualified generally, his testimony should also be excluded because he lacks the requisite knowledge to render a reliable opinion about "the physiological effect of a single 2-3 second CEW drive-stun to the lower back of a man who ingested ... cocaine."  (<u>Id.</u> at 3). In <u>Oliver</u>, Taser International, who was also a defendant in that case, argued that the forensic pathologist's methodology is not reliable because he "is not a cardiologist, an electrophysiologist...."  <u>Oliver</u>, 2011 WL 2174010 at *4. During his deposition, the forensic pathologist did not know how electricity from a Taser device could affect an individual's cardiac threshold potential and answered "I think that's a question best addressed by an electrophysiologist."  <u>Id.</u> at *5.  Also during his deposition, the forensic pathologist could not explain how a Taser device could cause ventricular fibrillation and stated: "I'm sure there are probably other more detailed mechanisms that an electrophysiologist could answer, but I'm not an

21

electrophysiologist." Id.

Unlike Oliver, this case does not concern a forensic pathologist who is testifying about the effects of electricity of a Taser device on the heart and unqualified to do such.  Rather this case concerns a cardiologist and electrophysiologist, a specialist about the effects of electricity on the heart, testifying about the physiological effect of electricity on the heart.

The Court finds Wilson v. City of Lafayette instructive and more comparable to the particular facts of this case.  No. 07-01844, 2010 WL 728336, *4–9 (D. Colo., Feb. 25, 2010).  In Wilson, police were in pursuit of a suspect and discharged an X26 model Taser device. Id. at *1. The suspect immediately fell to the ground, and when officers turned him over he was breathing and had a pulse. Id. Within a minute, the tasered individual stopped breathing and no longer had a pulse. Id. Any attempts to resuscitate the man failed and he died. Id. The district court judge allowed the expert witness testimony of the plaintiff's cardiologist and clinical electrophysiologist regarding potential causes of death of a man after a Taser CEW discharge from police, and denied defendant Taser International's motion in limine to exclude the testimony. Id. at *4–9, 14.

This case similarly involves a man in police custody and the administration of a Taser Electronic Control Device.[8] Mr. Ricks was already on the floor when the second ECD was discharged, but within minutes officers noticed Mr. Ricks was non-

---

[8]     The precise Taser device used by Deputy Brunet is unclear from the record, but it may have been an X26 model like in Wilson or an M26 model. See supra, note 5.

responsive, not breathing and did not have a pulse.  An ambulance was called, but a pulse was not re-established, and Mr. Ricks was declared dead upon arrival at the hospital.

The defendants in Wilson argued that the electrophysiologist's opinion was not reliable because it was insufficiently certain and the doctor improperly relied on mere temporal proximity. Id. at *6–8. The Wilson Court found that the doctor's opinion was "non-definitive" as opposed to "insufficiently certain" because the doctor was "unwilling to make a definitive claim that the Taser caused [decedent's] death." Id. at *8. The court explained: "[i]t would be one thing if [the electrophysiologist] had said he was uncertain about how the heart is capable of stopping, how electrical pulses could have acted upon the heart, or whether [decedent's] response was consistent with such an occurrence.  About such relevant matters, [the electrophysiologist] is certain." Id. (citing Daubert, 509 U.S. at 590 ("To be scientifically valid, the subject of expert testimony need not be 'known to a certainty' because, 'arguably, there are no certainties in science.' Rather, the testimony must rest on 'good grounds, based on what is known.'")). The Wilson defendants also argued temporal proximity is insufficient to prove causation. Id. at *7. The district court found that the electrophysiologist did not rely on temporal proximity alone and that defendant Taser International "applies an overly broad and logically flawed interpretation of post hoc ergo propter hoc, the logical fallacy that because as event follows another, it was necessarily caused by the earlier event." Id. The court found the sequence and timing of stuns are relevant to causation and,

23

when nearly simultaneous as in <u>Wilson</u>, can indicate a strong causal connection. <u>Id.</u> at *8.

Here, Taser International similarly argues that Dr. Kerwin's opinions improperly rely on speculation and temporal proximity. (Doc. 69-1 at 13–14, 18–19). As for speculation, like in <u>Wilson</u>, just because Dr. Kerwin is not always definite does not mean that his opinion is insufficiently certain. In his expert opinion, Dr. Kerwin states: "[t]he cause of decedents [sic] death was most certainly cardiac arrest, which under the circumstances described was potentiated by both cocaine intoxication and the application of the ECD delivered drive-stun." (Doc. 73-12 at 3). In an addendum to his expert opinion after more evidence was received, Dr. Kerwin's opinion became more concrete: "It is my medical opinion that the decedent succumbed to cardiac arrest due to the stress of repeated shocks applied while he was restrained in custody." While Dr. Kerwin may not be able to say with absolute certainty whether the cardiac arrest was caused by cocaine intoxication or the drive-stun from the ECD, certainty is not requirement for him to testify because there is little certainty in science and because he is otherwise qualified to give such testimony. Defendant also contends Dr. Kerwin relied on temporal proximity using the logical fallacy of *post hoc ergo propter hoc*. (Doc. 69-1 at 18–19). Taser International illustrates this logical fallacy with an example: "[j]ust because a rooster crows in the morning does not mean the crow caused the sun to rise." (<u>Id.</u> at 19). While temporal proximity alone may in circumstances not prove causation, we find temporal sequence and proximity can be a strong indicator of causation, especially when nearly simultaneous and

24

paired with other supporting evidence. The prosector who performed the autopsy on Mr. Ricks reported the struggle with police officers, including the administration of the Taser ECD, "would likely raise catecholamines" and from his review of the literature the use of ECDs seems to "raise stress hormones." (Doc. 66-5 at 15).

In addition to being relevant and reliable, the Court finds Dr. Kerwin's specialized knowledge about internal medicine and the effect of electricity on the heart would be helpful to explain medical concepts and causation to the jury. As Plaintiff contends: "No layperson could be expected to be knowledgeable on the use of an electronic control device on a person who is cocaine-intoxicated and in a state of excited delirium." (Doc. 85 at 7). The Court agrees and finds these are complex medical conditions and members of the jury would benefit from Dr. Kerwin's expert testimony. From there, it is up to counsel to use appropriate cross examination skills; the jury will also be instructed that it is not required to accept the testimony and that it may give it such credence as the testimony may deserve.

However, we find at this juncture Dr. Kerwin is not qualified to testify in any detail about how the Taser Electronic Control Device ("ECD") mechanically operates because, according to the submissions thus far, he lacks education and experience with Taser ECDs.  The Court reserves for trial more specific determinations about what Dr. Kerwin can say in this area because of the limited deposition material provided to the Court on this issue. Based upon the information available in the record, we cannot ensure the testimony is based on sufficient facts through reliable methodologies, so we defer that determination.

25

To summarize, based on the threshold requirement in Fed. R. Evid. 702 concerning Dr. Kerwin's knowledge, skill, experience, and training, we will admit his testimony insofar as it relates to the basic principles of internal medicine, medical causation, and electrophysiology.  Dr. Kerwin will also be permitted to testify generally as to the effects of electricity in relation to the human body.  His testimony may be excluded insofar as it relates to ECDs of any type including Taser models M26 and X26. Unless we are otherwise convinced, Dr. Kerwin will not be allowed to testify about anything specific to ECDs given his lack of qualifications regarding these devices. Defendant has the right to challenge Dr. Kerwin's testimony, underlying assumptions, methodology, and conclusions at trial through vigorous cross-examination and by presenting their own contradictory evidence.

Accordingly, Defendant's Motion in Limine to Exclude the Testimony of Dr. Walter Kerwin (Doc. 69) will be **GRANTED IN PART and DENIED IN PART** as detailed above.

### C.    Larry Alan Smith (Doc. 71)

Plaintiff offers Larry Alan Smith as an expert to testify about law enforcement, including the use of force and use of CEWs in law enforcement situations.  (Doc. 38 at 2; Doc. 84). The Court previously found Mr. Smith was qualified to testify as an expert witness on some points in a similar case involving alleged wrongful death following the administration of a Taser ECD in police custody. Thomas v. City of Winnfield, No. 08-1167, 2012 WL 1255265, at *5–6 (W.D. La. Apr. 13, 2012). Mr. Smith has extensive training and experience in law enforcement as a police officer, law enforcement

26

supervisor and investigator. (Doc. 84-1 at 12–15). Additionally, Mr. Smith has trained
law enforcement on the local, state, and national level and currently teaches classes
for a college Criminal Justice program. (Id. at 12–13). Mr. Smith has obtained
numerous certifications concerning the standards and continuum of force used by
police officers in situations similar to the incident involving Mr. Ricks. (Id. at 2, 12).
Mr. Smith has consulted or testified on the use of force in many cases and the Court
finds his testimony regarding force used by Sergeant Joffrion and Deputy Brunet
would be helpful to the members of the jury. (Id.).

Defendant contends Mr. Smith is unqualified to render opinions on ECDs or
their physiological effects on the human body.  (Doc. 71-1 at 8). Regarding the use of
ECDs, Mr. Smith's testimony is limited to standards of police conduct and when an
ECD may be used in law enforcement situations, including the incident involving Mr.
Ricks. Mr. Smith's certification as a Taser instructor does not include special medical
knowledge about the effects of a Taser ECD on the human body, and his testimony
insofar as it relates to physiological effects of ECDs will be excluded. For example, in
his report, Mr. Smith states: "Since Mr. Ricks quit breathing immediately after the
taser, it obviously contributed to the death of Mr. Ricks." (Doc. 84-1 at 9). Mr. Smith
lacks the medical expertise to opine Mr. Rick's cause of death and these opinions will
be excluded. However, Mr. Smith is qualified to testify about the continuum of force,
including the use of ECDs. Testimony regarding when a Taser device may be used in
law enforcement situations and the situation involving Mr. Ricks falls squarely into
the realm of continuum of force.

Mr. Smith includes several opinions in his report regarding Alexandria Police Department("ADP") and Rapides Parish Sheriff's Office ("RPSO") violating their own policies in their interactions with Mr. Ricks.

- They violated their own policy of obtaining medical clearance once they use an ECD on a prisoner. (Doc. 84-1 at 6).
- Sgt. [Joffrion] violated Taser International Training and Alexandria Police Department Policy, by using the Taser in this manner. (Id. at 9).
- Alexandria Police Personnel were negligent in their actions by not taking Mr. Ricks to the hospital or a pre jail check. They violated their own policy which ultimately resulted in the death of Mr. Ricks. (Id. at 10).

Defendant contends Mr. Smith should be excluded from testifying about APD and RPSO policies. (Doc. 71-1 at 9). Plaintiff declared Mr. Smith will not testify "whether or not Alexandria or Rapides Parish Officers violated their own conduct standards" so the parties appear to be in agreement on this point. (Doc. 84 at 5). However, for the sake of clarity, the Court finds such expert testimony would be excluded because it would not aid the trier of fact and the jury can determine whether officers violated their own standards of conduct without expert testimony on the matter.

In summary, Mr. Smith's testimony will be limited to the continuum of force standards applicable to law enforcement situations. Mr. Smith may opine about the force used by officers of the Alexandria Police Department and deputies of Rapides Parish Sheriff's Office against Mr. Ricks as well as the standards for providing medical attention during the incident. Accordingly, Defendant's Motion in Limine to Exclude the Testimony of Larry Alan Smith (Doc. 71) will be **GRANTED IN PART** and **DENIED IN PART**.

28

IV.    Conclusion

The disposition of these motions will be set forth in a separate order issued on

this date.

SIGNED on this 28 day of August, 2014 at Alexandria, Louisiana.

DEE D. DRELL

UNITED STATES DISTRICT JUDGE